UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREDDIE GILCHRIST,

Plaintiff,

v.                                                          ACTION NO. 2:18cv338

ANDREW SAUL,[1]
Commissioner of Social Security,

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Freddie Gilchrist ("Gilchrist" or "plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("SSA"), denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Gilchrist's motion for summary judgment (ECF No. 12) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**, and decision of the Commissioner be **AFFIRMED**.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

# I.    PROCEDURAL BACKGROUND

Plaintiff, Freddie Gilchrist, protectively filed applications for disability insurance benefits and Supplemental Security Income on May 19, 2014, alleging that he became disabled on that same date, due to conditions in his lower back, knees, wrists, and hips.[1] R. 14, 241. Following the state agency's denial of these claims, both initially, R. 73, 85–87, 99–100, and upon reconsideration, R. 103, 114–16, 127–28, Gilchrist requested a hearing before an Administrative Law Judge ("ALJ"). R. 14, 161–62.

ALJ Maryann S. Bright heard the matter on May 11, 2017, and issued a decision denying both DIB and SSI on June 21, 2017. R. 14–22, 29–57. On May 3, 2018, the Appeals Council denied Gilchrist's request for review of the ALJ's decision. R. 1–3. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted all administrative remedies, Gilchrist filed a *pro se* complaint in this Court on July 16, 2018, after the Court granted his application to proceed *in forma pauperis* on the same date. ECF Nos. 2, 3. The complaint does not identify any particular error on the part of the Commissioner, but asserts that Gilchrist cannot work due to worsening pain and problems with his lower back and legs. ECF No. 3 at 4–5. The Commissioner answered on August 31, 2018. ECF No. 8.

In response to the Court's order, Gilchrist filed a motion for summary judgment on October 2, 2018, and the Commissioner filed a corrected motion for summary judgment and supporting memorandum on November 2, 2018. ECF Nos. 12, 16, 17. Gilchrist filed an opposition to the

---

[1] "R." refers to the paper record transmitted to this Court from the Office of Appellate Operations of the Social Security Administration under a certification page dated August 13, 2018, which is consecutively paginated from 1 through 579.

Commissioner's motion on November 9, 2018. ECF No. 18.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.    FACTUAL BACKGROUND

After Gilchrist protectively filed his claims on May 19, 2014, he completed a disability report form on September 27, 2014, in which he alleged six conditions that limit his ability to work: pinched nerve in back, lower back pain, needs hip replacement, arthritis in hip, arthritis in wrists, and knee problems. R. 14, 241.

### A.    Medical Background Before Alleged Onset of Disability

Gilchrist had left knee replacement surgery in 2004. R. 299.  Bilateral knee x-rays on February 25, 2008, revealed a "[s]atisfactory appearance of the left knee prosthesis, without complications," and "[m]inimal degenerative changes in the right knee." R. 298.  A March 2008 consultative exam report from Seth Tuwiner, M.D., in connection with Gilchrist's earlier disability claim for the period from 2007 through 2009, states that Gilchrist "experiences severe constant pain in the bilateral knees" and "associated swelling most prominent in his left knee." R. 58, 61, 299.  Dr. Tuwiner diagnosed Gilchrist with severe bilateral knee arthritis. R. 301.

On March 7, 2012, Gilchrist went to a Sentara hospital emergency department for left chest muscle twitching. R. 383.  He was discharged in stable condition after an EKG showed normal sinus rhythm. R. 385.  In April, May, and July 2012, Gilchrist visited a chiropractor five times, for pain in his lower back, hips, and thighs. R. 437–39, 441.  On September 16, 2012, Gilchrist visited the emergency department again for heart palpitations, and was referred to the cardiology department for evaluation. R. 379.  He had no other complaints at that time, and his range of motion was normal. R. 380.  On October 20, 2012, Gilchrist returned to the emergency department for pain in his right wrist, and the records state that an x-ray examination was consistent with

3

degenerative joint disease. R. 377. He returned to the chiropractor on March 1, 2013, for a cervical adjustment and hip pain. R. 439.

On November 25, 2013, Gilchrist visited a Sentara emergency room for a rash on his hands, and was discharged in less than an hour. R. 309–10. The visit notes reflect that he was 52 years old, his "[p]ain assessment on discharge was 0," he had a history of chronic back pain and hypertension, and had a total replacement of his left knee and a "knee arthroscopy" of his right knee. R. 310–12, 321. The records note that, in the musculoskeletal category, he had a "[n]ormal range of motion," and had normal strength and range of motion in both hands. R. 313. He denied pain and discomfort. R. 318.

On January 11, 2014, Gilchrist visited a Sentara emergency room for soreness in his left shoulder that radiated into his left neck and was worse with abduction/adduction of the shoulder, as well as tingling down his left arm. R. 322–23, 325. He had no "other pertinent acute issues or complaints." R. 325. The records note a normal range of motion in the musculoskeletal category and neck. *Id.* He was given a prescription for Flexeril and Indocin, to be taken three times daily, "Norco as needed," "Valium for spasm," and warm compresses, and told to follow up with his primary care physician. R. 338. He was discharged after approximately an hour and a half, after an EKG was negative and the doctor determined no x-rays were needed. R. 322, 324, 329.

In the early morning of February 26, 2014, Gilchrist visited a Sentara emergency room for pain in his lower left back and that radiated into his hip and buttocks. R. 343–46. He was diagnosed with lumbar strain and sciatica. R. 345. The assessment of his musculoskeletal system noted that he had a normal range of motion, and was negative for myalgias (muscle aches), joint swelling, arthralgias (joint pain), a gait problem, and falls. R. 346–47. He also had normal sensation, strength, gait, and reflexes, as well as a normal straight leg raise test and Romberg test

(for balance and stability). R. 347. He denied the use of narcotics that night, but stated that he consumes a 6-pack of beer daily. R. 346. He was prescribed Voltaren-XR (used to relieve pain, swelling, and joint stiffness caused by arthritis) and continued on Flexeril. R. 354. He was also advised to rest, use ice as needed for the pain, avoid lying on the couch/bed for prolonged periods other than sleep, and apply a heating pad intermittently. R. 353–54. He was discharged to his home after approximately two hours. R. 343.

On the evening of March 9, 2014, Gilchrist presented to a Sentara emergency department for heart palpitations and a rapid heart rate. R. 362–63. He denied any shortness of breath, pain, or dizziness. R. 366. A nurse noted that he smelled of alcohol and had stated that he consumed two beers. *Id.* A chest x-ray that day was normal. R. 478. He was discharged approximately an hour later, after an EKG recorded no significant arrythmias. R. 362, 366. To address the palpitations, he was advised to not consume caffeine, alcohol, or chocolate and to not smoke. R. 472.

On May 6, 2014, Gilchrist went to Sentara Family Medicine Physicians for pain in his right wrist that had lasted for approximately one month and recently been aggravated by his use of a weed-eater. R. 360–61. He reported a history of degenerative joint disease, that the pain was worse when it was rainy, and that he had no relief with ibuprofen, ice, or a brace. R. 361. The examination revealed decreased range of motion in his right wrist, as well as tenderness and swelling. R. 428. He was given Tramadol (a synthetic opioid pain medication), and called the doctor later that day to report that he had no relief and to request a different medication. R. 362. He had elevated his wrist and used a brace on his wrist "for comfort." *Id.* The nurse who answered the phone suggested he try ice as well. *Id.* The next day, May 7, he reported that his pain was much improved. *Id.*

**B.    Medical Records After the Alleged Onset of Disability on May 19, 2014, and Through the ALJ Hearing**

On June 5, 2014, Gilchrist went to Sentara Family Medicine Physicians for conjunctivitis (pink eye) in his left eye. R. 358–59. The visit notes state that he had normal range of motion in his neck and musculoskeletal system. R. 360. He was given eye drops, and he called a week later, on June 12, to report that his eye had improved. R. 358.

On February 24, 2015, Gilchrist had an x-ray of his lumbar spine at Sentara after complaining of pain in that area. R. 448. The x-ray showed a "[s]ubtle loss of disc height at L3/4 suggesting degenerative disc disease." *Id.*

A May 1, 2015 x-ray showed that Gilchrist's "cervical spine [was] in normal alignment," and his prevertebral soft tissues were also normal. R. 486.

Gilchrist presented to a Sentara emergency department on July 31, 2015, for contusion of his left knee with superficial bruising. R. 491–92. He reported that he slipped and fell in his kitchen the day before and landed on his left knee, and that his left knee "appeared darker than his right knee" the following morning, prompting his visit to the emergency room. R. 493. He denied any pain, and the records reflect that he had no swelling or difficulty walking. *Id.* The records further note that his musculoskeletal assessment was "[n]egative for back pain and arthralgias," and he had a normal range of motion. R. 494–95. He was told to apply warm compresses and follow up with his primary care physician, and discharged within an hour of arriving. R. 491, 493, 496.

At approximately 8:30 a.m. on August 13, 2015, Gilchrist returned to the emergency department complaining of a "funny feeling in his chest." R. 503–04. The notes from a nurse state that Gilchrist was anxious and smelled of alcohol, and that Gilchrist reported he was "partying last night, hard" and he "drank a couple beers this morning too." R. 504. The examination notes

6

reflect normal range of motion in his musculoskeletal system and neck, and no complaints other than the brief chest pain that morning. R. 508–09. His EKG was normal, and he was diagnosed with unspecified chest pain and alcohol intoxication, before being discharged that afternoon. R. 505–06.

On January 26, 2017, Gilchrist visited a Sentara emergency department for lip numbness and tingling and elevated blood pressure. R. 535–37. Gilchrist denied any other symptoms, and was described in the records as alert and "[a]mbulatory with strong steady gait." R. 537. The records reflect that Gilchrist had mild hypertension, but his EKG was within normal limits, and his examination was consistent with focal paresthesia (pins and needles) or possible early Bells Palsy. R. 538, 548. Gilchrist was then 56 years old, and had a normal Romberg balance test and straight leg raise test, a normal finger-nose-finger test, and normal gait. R. 539. He had a normal heart rate and regular rhythm, and normal range of motion in his neck. *Id.* He reported drinking "a couple 12-packs of beer a week for the last few years." *Id.* He was discharged after approximately two and a half hours in stable condition, and told to follow up with his primary care doctor. R. 535, 538.

On February 27, 2017, Gilchrist visited Andrei San Marina, M.D., at the Virginia Beach Family Medical Center. R. 577. Gilchrist reported acute worsening of his chronic lower back pain over the previous months, and that he was taking Aleve for his back pain. *Id.* Dr. San Marina examined Gilchrist, and found that his gait was unremarkable, he had no vertebral or paraspinal tenderness, and the straight leg raising test was negative bilaterally for indications of sciatica. R. 577–78. Regarding range of motion, Dr. San Marina noted that Gilchrist had limited flexion and extension. R. 578. Dr. San Marina ordered several preventive cancer screenings and an MRI. *Id.*

7

On March 11, 2017, approximately two months before the ALJ hearing, Gilchrist had an MRI study of his lumbar spine. R. 561. The study found his alignment was within normal limits, but he had mild degenerative disc disease at L3–4 and L5–S1. *Id.* Specifically, he had a "small right foraminal disc herniation leading to mild narrowing" at L3–4, and a mild posterior annular bulge and posterior radial annular fissure at L5–S1. R. 561. The study also noted "[s]evere osteoarthritic change of the right and left femoroacetabular [hip] joints." R. 562. As part of this examination, Gilchrist completed a form explaining his symptoms. R. 565. He reported that he experienced pain in his "lower back when standing for a period of time, then pain moves to the lower part of both legs (including [his] hips)," and he had to "sit down for awhile to relieve the pain." *Id.* He also stated his left shoulder becomes painful and radiates to his left side. *Id.* In another form, Gilchrist checked the boxes for pain, swelling in his knee, decreased range of motion, abnormal gait, use of crutches, hypertension, and a knee replacement. R. 566. His only medication listed was Advil. *Id.*

On March 22, 2017, Gilchrist returned to Dr. San Marina. R. 575–76. Gilchrist recounted his symptoms consistent with the forms he completed for the March 11 MRI, and Dr. San Marina reviewed the results of that MRI. R. 575. Dr. San Marina's assessment was that Gilchrist had a herniated intervertebral disc of the lumbar spine, as well as unspecified hyperlipidemia (high cholesterol), and also screened Gilchrist for colon and prostate cancer. R. 575. He referred Gilchrist to orthopedic evaluation and treatment at MCV for the herniated disc. R. 575–76.

## C.   State Agency Medical Opinions and Consultative Exams

On January 13, 2015, Peter Birk, M.D., conducted a consultative examination of Gilchrist, when Gilchrist was 54 years old. R. 443–44. Gilchrist reported that his principal problem is back pain, which was worse in the morning and brought on by exertion during the day, and that he

cannot drive at times due to pain. R. 444, 446. Gilchrist stated that he drinks a six-pack three or four times per week, and takes an occasional ibuprofen "that does help with the pain, but does not increase his functional capacity." R. 444. Dr. Birk found that Gilchrist's gait and station were normal, and that he did not use an assistive device, although he noted that Gilchrist "has a crutch he keeps in his truck" that "has a well[-]worn tip." R. 445–46. Dr. Birk further noted that Gilchrist's grip strength was "five out of five bilaterally," and that he was asymptomatic at the time of the examination. R. 446.

On March 12, 2015, Wyatt S. Beazley, III, M.D., signed the initial decision denying Gilchrist's application for disability. R. 83, 85–86. That decision concluded that, based on his residual functional capacity, Gilchrist can perform light work. R. 84. Dr. Beazley noted that Gilchrist's residual functional capacity, which was reduced to compensate for impairments and symptoms that could be medically determined, had several limitations, including: occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or sitting for six hours in an eight-hour workday, postural limitations, and decreased range of motion in his thoracolumbar spine. R. 81–82.

On July 14, 2015, Richard Surrusco, M.D., signed the decision denying Gilchrist's reconsideration. R. 103, 112, 114. Dr. Surrusco noted the same limitations as Dr. Beazley regarding Gilchrist's residual functional capacity, and affirmed the finding that Gilchrist was capable of light work. R. 111–13. Dr. Surrusco also opined that Dr. Tuwiner overestimated the severity of Gilchrist's limitations, because his examination was "based only on a snapshot of the individual's functioning." R. 113.

**D.      The ALJ Hearing and Vocational Expert Testimony**

ALJ Bright held a hearing on the morning of May 11, 2017, at which Gilchrist was represented by J. Russell Fentress, IV, Esq. R. 31, 57.

Gilchrist was 56 years old at the time of the hearing, and testified that his disability began on May 19, 2014, when he had to quit working for a real estate agent due to pain in his back. R. 32–33. He was divorced in 2008 and had no children, had no source of income or medical insurance, and his driver's license was suspended after a DUI and accident in the prior year. R. 33–35, 214.

Gilchrist moved in with his mother in August 2016 to help her after she had a stroke. R. 34. He helps his mother by "mak[ing] sure she gets dressed" and has breakfast and dinner, and doing a "limited amount" of cleaning, such as dish washing. *Id.* He helps her for "short periods of time throughout the day." R. 47.

Gilchrist had not worked since May 2014. R. 36. At that time, he had been working for approximately three years as an inspector of foreclosed homes for a real estate agent, which involved "check[ing]" on the properties for signs of vandalism, changing locks, and putting up signs. R. 36–37; *see also* R. 226–34 (work history report from 2001 through 2013), 242 (self-reported work history), 251. He did not do other repairs on the properties, and did not have to lift or carry anything heavy, but it "was a problem" to go up and down stairs in a two-story property.[2] R. 36–37, 257.

From June 2009 to October 2010, Gilchrist worked at the Belvedere Resort Motel, taking out trash, and cleaning the windows, pool, and chairs. R. 37, 250, 252. Every day, he had to carry

---

[2] Although not discussed in his testimony, in his reports to SSA, Gilchrist also listed work as a newspaper deliveryman from March to June of 2009. R. 250, 253.

a five-gallon bucket of water, weighing over 20 pounds, which "caus[ed] problems" going up and down steps. R. 37. He left that job because of problems with his back. R. 37–38, 257.

Before the motel, Gilchrist worked for Macy's for approximately 25 years. R. 38. He began working with that company in 1982, when it was Miller & Rhoads department store, and ended in 2007. R. 38, 250. He loaded and unloaded trailers, lifting furniture and other merchandise weighing "[o]ver 50 to 100 pounds." R. 38, 254–55. In 2004, he had knee replacement surgery on his left knee, and switched to light-duty customer service work. R. 38, 42. His duties included gift wrapping, "ticket master, and back office," as well as lifting boxes weighing over ten pounds, and lifting a cash drawer weighing over 20 pounds four or five times per week. R. 39. He was physically able to do this job because Macy's provided him a chair so he could sit or stand "whenever [he] needed." R. 39–40. He was terminated from that job in a department-wide firing, which occurred because the department employees did not report theft by the department supervisor. R. 39.

The ALJ asked Gilchrist to explain why he cannot work, and Gilchrist responded that his "back bothers [him] a lot, especially when [] standing or sitting for a long period of time," and he "can't sit because it bothers [him] so bad that [he has] to lay down." R. 41. He can sit for 30 to 45 minutes, and then the pain would hit and he would stand for 30 to 40 minutes, and then he would lay down when it bothered him again.[3] R. 43. He lies down for about six hours during the day, including during workday hours, and has trouble sleeping because of his back pain. R. 41, 45. He said that, when the "pain hits [him] in [the] lower back it shoots down to [his] legs," which happened "every day just about." R. 41. He stated that it was hard to tie his shoe, and "[a]nything having to lift, or stand, or bend, squatting, it bothers" him. *Id.* He takes over-the-counter ibuprofen

---

[3] Gilchrist asked to stand approximately half-way through the hearing. R. 47.

"[w]henever the pain hits," which was weekly; ibuprofen helps ease the pain, and he does not regularly take any other medications. R. 41–42. He said that he had tried some prescribed painkillers in the past, but the pain "would come back." R. 48.

Gilchrist testified that he went to the emergency room in January 2017 for numbness, but had not recently gone to the emergency room for his back, and he was waiting on a response from the Medical College of Virginia/Virginia Commonwealth University (MCV/VCU) to see an orthopedist for his back, after being referred through the Virginia Beach Family Medical Center. R. 42, 45. His 2004 knee surgery was his only surgery, he does not drink or use drugs, and he stopped drinking a year ago, although he used to be a heavy drinker. R. 42–43.

Regarding his activities of daily living, Gilchrist reported that he does not have problems with bathing and dressing. R. 44. He washes his clothes and dishes, and prepares meals and goes grocery shopping for himself and his mother. *Id.* He gets up in the morning, gets dressed and eats, and "pretty much just watch[es] TV." *Id.* His hobby is drawing, although he used to play basketball before his knee surgery and back problems. *Id.* He said that his condition has gotten worse since he stopped working, and that, although he could sit or stand when he worked in customer service, he now had to lie down to relieve the pain. R. 46.

Kathleen Sampeck, a vocational expert, testified by telephone that Gilchrist's prior work was classified as follows: the unloader job is heavy, semi-skilled work, SVP 3; the customer service job is light, semi-skilled work, SVP 4; the hotel cleaning position is medium, semi-skilled work, SVP 3; and the property inspector job "was not consistent with observing inspector because of the skill level involved," and it "more closely coincides with a general inspector . . . classified

as light, semiskilled, SVP 4."[4] R. 49–50. The ALJ asked the expert to opine whether an individual could perform any of those past jobs, assuming the hypothetical individual had the following limitations:

> light exertion, specifically lifting, carrying, pushing or pulling 20 pounds occasionally [or] 10 pounds frequently, capable of standing and/or walking approximately six hours per eight-hour workday and sitting approximately six hours per eight-hour workday with normal breaks. Occasional climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, occasional stooping, crouching, kneeling, and crawling.

R. 50.

The vocational expert concluded that such a hypothetical person could perform both the customer service representative and general inspector positions as those jobs are "generally performed and actually performed" by Gilchrist, even if the individual was limited to frequent balancing. R. 50–51. The individual could also perform those two light jobs, as generally performed and as actually performed by Gilchrist, if the individual "had to avoid concentrated exposure to extreme" heat and cold, "vibration, and hazards of operating dangerous vehicles and machinery, and working around unprotected heights." R. 51.

The vocational expert further stated that, if the individual was limited to "no pushing or pulling with the bilateral lower extremities," he could still perform the customer service representative job, but the "general inspector would require driving to various locations, so there would be pushing with the lower extremity in order to operate a motor vehicle." R. 51–52. If the individual had to alternate between sitting and standing every 30 minutes, the expert opined that

---

[4] "SVP" stands for specific vocational preparation, and is "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, Appendix C, https://occupationalinfo.org/appendxc_1.html. SVP 3 refers to a job that takes a typical worker "[o]ver 1 month up to and including 3 months" to learn, and SVP 4 refers to a job that takes a typical worker "[o]ver 3 months up to and including 6 months." *Id.*

he could not do either job; the customer service representative position "would allow some alternating but not for 30 minutes at a time." R. 53–54. The expert also stated that an individual could not perform these positions if he was limited to standing and/or walking for four hours per eight-hour workday. R. 54.

The expert explained that an individual with all the limitations, including the limitations on alternating sitting or standing, could do other work "consistent with that hypothetical." *Id.* She provided three example positions for the hypothetical individual: (1) cashier, with 125,000 such jobs nationally; (2) copy machine operator, with 16,000 such jobs nationally; and (3) non-parcel mail sorter, with 16,000 jobs nationally. R. 54–55. The expert did not think there were transferable skills from Gilchrist's past work, and concluded there would be no full-time work available for a hypothetical individual who had to lie down for six out of eight hours during the day. R. 56.

## III.    THE ALJ'S DECISION

The ALJ concluded that Gilchrist was not under a disability from May 19, 2014, through the date of the decision, June 21, 2017. R. 15, 22. The ALJ first determined that Gilchrist was insured for SSA disability purposes through December 31, 2018. R. 14. She also noted that Gilchrist had a prior ALJ decision on October 13, 2009, which was not appealed, and that this decision was final and binding regarding his disability through that date.[6] R. 15.

---

[6] The prior disability claim was denied by an ALJ decision on October 13, 2009. R. 58. Gilchrist filed that claim for both DIB and SSI on December 11, 2007, alleging a disability onset date of November 3, 2007, when he was 46 years old. R. 61, 69. The ALJ found that Gilchrist had a severe impairment due to bilateral osteoarthritis of the knee and total left knee replacement, and his complaint of lower back pain was "not medically determinable" and did not "cause more than minimal limitation." R. 63–64. The ALJ then determined that Gilchrist did not meet or medically equal the musculoskeletal system listings, and that he had the residual functional capacity to perform the full range of light work, including his past relevant work as a customer service representative. R. 64–65, 68. At that time, Gilchrist reported that he could not stand or sit for long periods, or lift or carry more than 15 to 20 pounds. R. 65.

14

The ALJ next applied the five-step sequential evaluation process for determining whether an individual is disabled under the requirements of the Social Security Act.[6] R. 15–16. At step one, she found that Gilchrist had not engaged in substantial gainful activity since May 19, 2014, the alleged date of his disability onset. R. 17. At step two, she found that Gilchrist had several severe impairments: a herniated intervertebral disc of the lumbar spine, osteoarthritis of the knee, and degenerative joint disease of the hip. R. 17. She also found that these impairments "significantly limit the ability to perform basic work activities." R. 17. However, at step three, the ALJ concluded that Gilchrist's impairments did not meet or medically equal the severity of a listed impairment. R. 17–18. The ALJ specifically evaluated his impairments under the musculoskeletal system listing, section 1.00, with particular attention to sections 1.02 and 1.04, and determined that his impairments, singly or in combination, did not establish the "specific clinical signs and diagnostic findings required to meet or equal" the listing requirements. R. 17.

At step four, the ALJ found that Gilchrist had the residual functional capacity to perform light work with certain limitations. R. 18. She noted that Gilchrist's impairments "could reasonably be expected to produce" his alleged symptoms, but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 19. Gilchrist testified that he "spent six

---

[6] "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). In order to qualify for DIB, an individual must be under age 65 and establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

hours a day on his back due to pain," could sit for 30–45 minutes before having to stand, and stand 30–40 minutes before needing to lie down, and that he cooked, did limited cleaning, grocery shopped for himself and his mother, and had no problems dressing or bathing. R. 18–19. The ALJ recounted Gilchrist's x-rays, an MRI, emergency room visits, and consultative examination, and concluded that his "severe impairments could reasonably be expected to cause the alleged symptoms," but his "allegations are not supported by the objective clinical findings, the conservative level of treatment, or his activities of daily living." R. 19–20. She noted that his "physical examinations consistently demonstrated normal" strength, gait, sensation, and mild or no tenderness, he managed his pain with over-the-counter medication, and his "activities of daily living including cooking, limited cleaning, and grocery shopping [] are consistent with the ability to perform light work." R. 20.

The ALJ gave moderate weight to the consultative examination finding that Gilchrist was asymptomatic, because the x-rays and his "complaints of pain support limiting him to less than a full range of light work." R. 21. She gave great weight to the state agency consultants' assessments "because they are generally consistent with the mild physical examination findings, the very conservative level of treatment, and the claimant's activities of daily living." *Id.* She also accounted for the 2009 ALJ decision, noting that the "more recent evidence of degenerative disc disease of the lumbar spine supports somewhat greater limitations" than had been found in 2009. *Id.* Based on all of this, the ALJ found that Gilchrist

> has the residual functional capacity to perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b) that requires lifting, carrying, pushing and pulling, twenty pounds occasionally and ten pounds frequently; standing and/or walking approximately six hours in an eight-hour workday; and sitting approximately six hours per eight-hour work day with normal breaks. The claimant can perform jobs that require no more than occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; no more than occasional stooping, crouching, kneeling, and crawling; and no more than frequent balancing. He should

avoid concentrated exposure to extreme heat, extreme cold, vibration, and hazards of operating dangerous vehicles and machinery and working around unprotected heights.

R. 18.

Having determined Gilchrist's residual functional capacity, the ALJ next found that he was capable of performing his past relevant work as a customer service representative and general inspector, because those positions did not require the performance of work-related activities precluded by his residual functional capacity. R. 21. Gilchrist had performed those jobs within the last 15 years, working as a customer service representative from January 2001 to December 2007, and as a general inspector from August 2011 to May 2014.[7] *Id.* He held these positions long enough to learn their duties, according to the vocational expert's testimony that those positions are classified as light, semi-skilled work that take three to six months of training. *Id.* The vocational expert further testified that an individual with Gilchrist's vocational background and residual functional capacity could perform both jobs as they are generally performed in the national economy. R. 21–22. The ALJ determined that, because Gilchrist testified that he had to lift up to 100 pounds as a customer service representative, he could not perform that job as he actually performed it, but he could perform that work as generally performed in the national economy. R. 22.

The ALJ accordingly concluded that Gilchrist was not under a disability and not entitled to receive either disability insurance benefits or supplemental security income. *Id.*

---

[7] The SSA considers a claimant's work experience in the 15 years preceding a disability claim. *See, e.g.,* 20 C.F.R. § 404.1565(a) ("We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity. We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled (or when the disability insured status requirement was last met, if earlier) applies.").

## IV.   **SUMMARY JUDGMENT MOTIONS**

Gilchrist's summary judgment motion included new medical records that were not presented to the ALJ or the Appeals Council. From these records, he contended that Dr. Mounasamy at MCV/VCU hospital determined that he needed both of his hips replaced due to osteoarthritis, based on x-rays on July 25 and September 25, 2018.[9] ECF No. 12 at 1, 3–4. He also cited a January 29, 2018 report from an orthopedist that prescribed physical therapy for his chronic low back pain.[10] *Id.* at 8. He asserted that he had to stop working because of pain in his lower back, hips, and legs, and that he could no longer do things he enjoyed doing, such as playing sports and running. *Id.* at 1–2.

The Commissioner also moved for summary judgment. The Commissioner argued that substantial evidence supported the finding that Gilchrist was not disabled under the Social Security Act, because, notwithstanding his back, hip and knee pain, he was capable of performing light work, including past relevant work as a customer service representative and general inspector. ECF No. 17 at 1, 8.

In his reply, Gilchrist argued that the Court should consider his 2018 x-rays because they "pertain[] to [his] medical conditions." ECF No. 18 at 1. He further argued that his medical condition was severe enough to prevent him from working. *Id.* at 1–2. He claimed that he could

---

[9] Gilchrist attached documents from the September 25, 2018 visit with Dr. Mounasamy, which noted bilateral hip pain as the reason for his visit, but did not include a recommendation regarding hip surgery. ECF No. 12 at 3. Instead, the documents from that visit are forms that were apparently meant for Gilchrist to complete with information about his symptoms. *Id.* at 4–7. He also attached a final report and physical therapy prescription dated January 29, 2018. *Id.* at 8.

[10] Although Gilchrist testified at the ALJ hearing that he was waiting on a response from MCV/VCU to see an orthopedist for his back, it does not appear that, after seeing an orthopedist and obtaining a report in January 2018, this report was part of the record before the Appeals Council when it denied his appeal in May 2018. R. 1–10 (Appeals Council documents) 42, 45 (ALJ hearing transcript excerpts); ECF No. 12 at 8 (January 2018 report).

not perform his customer service job because it "requires a lot of standing for a long period of time," and could not work as a general inspector because it involved climbing stairs, driving, and sitting for a long time. *Id.* at 2. Gilchrist chiefly argues that the ALJ erred in her findings regarding his residual functional capacity and ability to perform his past relevant work. *Id.* at 2–3.

## V.   **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## VI.    ANALYSIS

### A.    There is substantial evidence to support the ALJ's finding that Gilchrist is not disabled.

The SSA follows a five-step sequential evaluation to determine whether an applicant is disabled for SSI or disability insurance: (1) whether the person is engaged in substantial gainful activity; (2) whether the person has a severe medically determinable physical or mental impairment that is expected to result in death or has lasted or is expected to last for a continuous period of twelve months; (3) whether the impairment meets or equals a listing; (4) whether, based on the person's residual functional capacity, he can still perform his past relevant work; and (5) whether the applicant can adjust to other work. 20 C.F.R. §§ 404.1520, 416.920. For steps one through four, "the burden of production and proof is on the claimant," but if the evaluation reaches step five, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992), *as amended* (May 5, 1993).

Here, the findings at steps one through three are largely undisputed. There is substantial evidence to support the ALJ's finding at step one that Gilchrist was not engaged in substantial gainful activity. R. 17. It is undisputed that Gilchrist had not worked since May 19, 2014, and Gilchrist testified accordingly at the hearing before the ALJ.[10] R. 33.

---

[10] There is also no dispute that Gilchrist met the insured status requirements for disability insurance benefits through December 31, 2018. R. 17. *See* 20 C.F.R. § 404.130.

The medical record substantially supports the ALJ's finding at step two that Gilchrist had a herniated intervertebral disc of his lumbar spine, osteoarthritis of the knee, and degenerative joint disease of the hip, and that all of these impairments were severe. R. 17, 63–64, 377, 561–62, 575.

There is substantial evidence to support the ALJ's finding at step three that Gilchrist did not meet or medically equal the listings under section 1.00 of the musculoskeletal system, particularly listings 1.02 and 1.04. R. 17.

There is substantial evidence to support the ALJ's finding that Gilchrist did not meet or medically equal Listing 1.02 for a major dysfunction of a joint due to any cause. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.02. He did not have an extreme limitation of the ability to walk; for example, he did not require use of an assistive device to walk, although he kept a crutch in his truck, and he was repeatedly described as having a normal gait. R. 20, 445–46. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00(B)(2)(b)(2) ("[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, [or] two crutches or two canes . . . ."). He was also able to perform fine and gross movements with his arms, as, for example, he could cook meals, wash clothes, dress, bathe, perform limited cleaning, and had full (5/5) grip strength in both hands. R. 19–20, 446.

There is substantial evidence to support the ALJ's finding that Gilchrist did not meet or equal Listing 1.04 for disorders of the spine, even though Gilchrist had some osteoarthritis and degenerative disc disease. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Gilchrist did not satisfy any of the elements of that listing because he did not have a positive straight-leg raising test or motor loss accompanied by sensory or reflex loss, R. 20, 347, 539, did not have arachnoiditis (inflammation of the membrane surrounding the nerves of the spinal cord characterized by severe burning pain and neurological problems), and, although he had some lumbar spinal stenosis

21

(narrowing), he was able to ambulate effectively.  R. 20, 561; *see also* 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 1.04.

> 1.    **There is substantial evidence to support the findings at step four regarding residual functional capacity and ability to perform past relevant work.**
>
> > a.    **Substantial evidence supported the finding that Gilchrist had a residual functional capacity for light work.**

The SSA regulations provide that, after step three of the ALJ's five-part analysis but prior

to deciding whether a claimant can perform past relevant work at step four, the ALJ is responsible

for assessing the claimant's residual functional capacity.  20 C.F.R. §§ 404.1545(a), 404.1546(c),

416.945(a), 416.946(c).  The residual functional capacity is a claimant's maximum ability to work

despite his limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ then uses that

residual functional capacity to determine whether the claimant can perform his past relevant work.

20 C.F.R. §§ 404.1545(a)(5)(i), 416.945(a)(5)(i).  The determination of the residual functional

capacity is based upon a consideration of all the relevant medical and other evidence[11] in the

record, including medical opinions.[12]  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Felton-Miller*

*v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011).

The ALJ found that Gilchrist had a residual functional capacity for light work with some

postural and environmental limitations, namely:  no more than occasional climbing of ramps and

stairs; no climbing ladders, ropes, or scaffolds; no more than occasional stooping, crouching,

---

[11] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

[12] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

kneeling, and crawling; no more than frequent balancing; avoiding concentrated exposure to extreme heat, cold, and vibration; and avoiding operating dangerous vehicles and machinery and working around unprotected heights. R. 18–21. Light work is defined by SSA as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); *see also* 20 C.F.R. § 416.967(b) (defining light work for SSI).

In deciding that Gilchrist had a residual functional capacity for light work, the ALJ considered consistent reports from treating doctors and the consultative examiner that Gilchrist had normal gait and station, normal motor and sensory function, normal range of motion, and normal strength. R. 18–21, 346–47, 445–46, 539, 578. She considered x-ray and other imaging that showed satisfactory appearance of Gilchrist's knee replacement, subtle loss of disc height suggesting degenerative disc disease in his lumbar spine, disc herniation in his lumbar spine leading to mild narrowing, and osteoarthritis in his left and right hip joints. R. 18–20, 298, 448, 561–62, 571. She also considered Gilchrist's testimony about his activities of daily living, such as cooking, doing dishes, grocery shopping, and caring for his mother. R. 19–20, 34, 47.

In addition to these sources, the ALJ also considered the available opinion evidence. She considered Dr. Birk's consultative examination finding that Gilchrist was asymptomatic, and assigned it moderate weight in light of the radiographic evidence and Gilchrist's complaints of pain, which the ALJ concluded supported limiting him to less than a full range of light work. She also considered the opinions of Dr. Beazley and Dr. Surrusco, who both concluded that, based on

his residual functional capacity, Gilchrist was capable of performing light work. R. 84, 86, 113, 115. Dr. Beazley noted that this residual functional capacity was based on various limitations, including: occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or sitting for six hours in an eight-hour workday, postural limitations, and decreased range of motion in his thoracolumbar spine. R. 81–82. The ALJ gave these opinions great weight because they were consistent with the "mild physical examination findings, the very conservative level of treatment, and the claimant's activities of daily living." R. 21. None of Gilchrist's treatment records from his emergency room or other doctor visits recommends any restrictions on his ability to work.

The ALJ also concluded that Gilchrist's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record," and so those statements were "found to affect [his] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." R. 19. The ALJ determined that the "allegations are not supported by the objective clinical findings" and the other evidence in the record, including Gilchrist's activities of daily living, care for his mother, conservative treatment and occasional use of over-the-counter pain medication, and the remarks of examining doctors concerning his normal gait, grip, and strength. R. 19–20, 34, 47. The record supports the ALJ's decision to accept Gilchrist's statements to the extent they were consistent with the other evidence. *See, e.g.*, *Craig*, 76 F.3d at 589 (specifying that a reviewing court is not to make credibility determinations); *Hays*, 907 F.2d at 1456 (noting the ALJ bears responsibility for "mak[ing] findings of fact and . . . resolv[ing] conflicts in the evidence").

24

Given the above objective medical evidence, opinions, and testimony, the ALJ's finding that Gilchrist had a residual functional capacity for light work is supported by substantial evidence.

### b. Substantial evidence supported the finding that Gilchrist could return to his past relevant work.

After finding that Gilchrist had a residual functional capacity for light work, the ALJ next determined that he was capable of returning to his past relevant work as a customer service representative and a general inspector, because that work did not require the performance of work-related activities that were precluded by his residual functional capacity. R. 21. Both of those jobs are classified as light, semiskilled work. R. 21.

The ALJ found that Gilchrist was able to perform the job of a general inspector as actually and generally performed in the national economy, based on the testimony of the vocational expert. R. 21–22. She also determined that, based on the vocational expert's testimony, Gilchrist was able to perform the job of a customer service representative as generally performed in the national economy, but not as Gilchrist had actually performed that position, because he had to lift up to 100 pounds or more when he worked as customer service representative. R. 21–22.

The "ALJ may use the services of a vocational expert or look to the DOT [Dictionary of Occupational Titles] when determining the demands of Plaintiff's past relevant work and whether his residual functional capacity allows him to perform such work." *Blankenship v. Berryhill*, No. 1:17-CV-1359, 2018 WL 4610651, at *11 (E.D. Va. Aug. 31, 2018) (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)), *report and recommendation adopted*, 2018 WL 4609941 (E.D. Va. Sept. 24, 2018). If a claimant's former job "involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy" and the claimant "cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties

25

as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'"  Social Security Ruling ("SSR") 82-61, 1982 WL 31387 at *2.

There is substantial evidence to support the ALJ's finding that Gilchrist could return to his past relevant work as a general inspector, and to his work as a customer service representative as generally performed in the national economy.  Gilchrist had the training and experience needed to perform those jobs, as the vocational expert testified that such workers take three to six months to learn those jobs, and Gilchrist had years of experience in both types of work.  R. 21, 50.  These positions are classified as light work, and as noted above, there was substantial evidence to support the finding that Gilchrist had a residual functional capacity for light work.  Based on a hypothetical individual limited to light exertion (lifting, carrying, pushing or pulling 20 pounds occasionally or 10 pounds frequently), standing or walking approximately six hours per workday and sitting approximately six hours per workday with normal breaks, occasionally climbing ramps and stairs, not climbing ladders, ropes, or scaffolds, and occasional stooping, crouching, kneeling, and crawling, the vocational expert opined that the individual could perform Gilchrist's past work as a customer service representative and general inspector, both as generally performed in the national economy and as Gilchrist actually performed those jobs.  R. 50–51.

The ALJ's determination is accordingly supported by substantial evidence, considering the testimony of the vocational expert regarding the ability of a hypothetical individual with Gilchrist's past work experience and physical limitations to return to Gilchrist's past relevant work and the finding that Gilchrist had a residual functional capacity for light work.

**B.      The information and medical records included with Gilchrist's summary judgment motion do not support a remand.**

When reviewing an ALJ's decision, district courts "cannot consider evidence which was not presented to the ALJ." *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996). Accordingly, the Court cannot consider the facts in Gilchrist's motion for summary judgment relating to developments after the ALJ hearing, specifically the January 2018 report from an orthopedic surgeon and x-rays in July and September 2018. ECF No. 12.

Although Gilchrist has not requested a remand for consideration of this additional evidence, which arose after the ALJ's decision, he does assert that the "new evidence about [his] hips [is] relevant to [his] claim." ECF No. 18 at 3. A "court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g). However, in order to submit new evidence to the Appeals Council after an ALJ issues a decision, such evidence also must "relate[] to the period on or before the date of the [administrative law judge] hearing decision." 20 C.F.R. § 404.970(a)(5), (b). To the extent Gilchrist attempts to present new or additional evidence, it does not relate to the period before the date of the ALJ hearing decision. He has not met the statutory conditions required to support a remand of this matter to the Commissioner.

## VII.   RECOMMENDATION

For the foregoing reasons, this Court recommends that Gilchrist's motion for summary judgment (ECF No. 12) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

27

## VIII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 10, 2019